IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 06–cv–01619–EWN

TANNA M. WOODS,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner
of Social Security,

      Defendant.

_____

**ORDER AND MEMORANDUM OF DECISION**
_____

      This is a social security benefits appeal.  Plaintiff Tanna M. Woods challenges the final

decision of the Commissioner of Social Security (the "Commissioner"), denying her application

for disability insurance benefits.  Jurisdiction is premised upon 42 U.S.C. § 405(g) (2006).

## FACTS

*1.*    ***Medical Evidence Before the ALJ and the Appeals Council***

      Plaintiff was born on July 23, 1970 and was thirty-two years old at the onset of her alleged

disability.  (Admin. R. at 52 [filed Oct. 20, 2006] [hereinafter "Admin. R."].)  Plaintiff has a high

school education and has worked in the vocationally relevant past as a house cleaner,

neighborhood servicer for the police department, emergency dispatcher for the police department,

waitress, and stocker.  (*Id*. at 71, 78–86.)  Plaintiff alleged in her disability application that she

became unable to work beginning on November 13, 2002 due to the effects of her broken elbow and pelvis.  (*Id.* at 52, 65.)

On November 13, 2002, Plaintiff was involved in an automobile accident in which she appeared to sustain no major injuries.  (*Id.* at 118.)  After the accident, she was walking along the road in the dark, lost her way, and fell between twenty and twenty-five feet over an embankment and into a ravine.  (*Id.*)  She was transported to Memorial Hospital in Colorado Springs, Colorado, where x-rays revealed a fracture of her pelvis and left elbow, as well as several fractures of her lumbar spine.  (*Id.* at 119.)  Additionally, Plaintiff had a "[m]inor head injury," described as a "forehead abrasion."  (*Id.*)  On November 18, 2002, Plaintiff underwent surgery to stabilize both her pelvis and elbow, and various pieces of hardware were installed in both sites to aid with that stabilization.  (*Id.* at 96–102.)  After her surgeries, Plaintiff was released to the rehabilitation unit of the hospital, where she underwent physical, occupational, and speech therapy.  (*Id.* at 93, 181–90.)  Her speech language pathologist noted that Plaintiff had increased sensitivity to noise, trouble with memory, decreased attention, tangential and verbose speech, as well as problems following complex directions and maintaining her train of thought.   (*Id.* at 183.) At discharge from the hospital on November 26, 2002, Plaintiff's occupational therapist indicated that Plaintiff scored five out of seven in the areas of attention, memory, problem solving, and safety and judgment.  (*Id.*)  She scored a three out of seven in her ability to orient person, place, and time.  (*Id.*)  Plaintiff had a flat affect and was capable of following one-step commands.  (*Id.*) The therapist also noted Plaintiff had impaired thought organization, sequencing, abstract reasoning, insight, delayed recall, and mathematical calculation abilities.  (*Id.* at 188.)

Also at discharge, Marc S. Kelly, M.D. found: (1) "[f]rom a medical standpoint [Plaintiff was] actually quite stable and with few difficulties other than some pain control;" and (2) Plaintiff exhibited findings consistent with mild traumatic brain injury and posttraumatic stress disorder ("PTSD"), "probably related to [Plaintiff's] walking off [the] embankment and incurring a subsequent injury." (*Id.* at 181–82.)

Richard P. Meinig, M.D., who performed Plaintiff's pelvic surgery, noted that Plaintiff had an unremarkable hospital course following her surgeries. (*Id.* at 213–30, 95.) On December 6, 2002, Dr. Meinig determined Plaintiff was to "remain non-weight bearing for an additional six weeks." (*Id.* at 216.) Beginning in January 2003, Plaintiff received physical therapy for her hip and elbow. (*Id.* at 200–01.) The physical therapist noted Plaintiff had symptoms of PTSD. (*Id.* at 200-01.) Also in January 2003, Edward S. Szuszczewicz, M.D., the physician who performed Plaintiff's elbow surgery, noted that she complained of "significant pain" and "severe extension contracture, and that her range of motion was seventeen to fifty degrees in her left elbow. (*Id.* at 197.)

On February 14, 2003, Dr. Meinig allowed Plaintiff to progress to weight-bearing activity as tolerated and prescribed physical therapy. (*Id.* at 214.) Regarding Plaintiff's elbow, Dr. Meinig noted on March 14, 2003 that she: (1) was doing "quite well" with her occupational and physical therapy; (2) had "gain[ed] a significant amount of her flexion and extension back;" and (3) "still ha[d] about a [forty] degree extension lag." (*Id.* at 213.) Regarding Plaintiff's pelvis, Dr. Meinig found "her pain ha[d] gradually improved." (*Id.*) He allowed her to progress to full activities "as tolerated." (*Id.*)

On June 6, 2003, Dr. Meinig wrote a letter expressing his opinion that Plaintiff's elbow and pelvic injuries would render her "unsuitable for employment for a period of one year." (*Id.* at 211.)  He further stated that "[a]t the one year point I expect that we may be able to begin light activities with an ultimate return to sedentary or light duty type office work." (*Id.*)  There are no treatment records from July 2003 through September 20, 2004.

On September 21, 2004, Dr. Meinig noted that "[Plaintiff] ha[d] gone back to doing domestic house cleaning as work." (*Id.* at 223.)  She complained of intermittent leg numbness and tingling on her right side.  (*Id.*)  Physical exam showed negative straight leg raising, "well preserved" deep tendon reflexes, and possible radiculopathy.[1]  (*Id.*)  Dr. Meinig concluded: "[a]t this point, her problems again seem to be quite mechanically stable and as her symptoms on her left side are fairly minimal, I would not be too concerned that there is a pelvic explanation." (*Id.*)

On May 18, 2005, Dr. Meinig noted "[Plaintiff] is in general doing fairly well although notes that light housekeeping that she has been trying to do has not been well-tolerated." (*Id.* at 222.)  He found her pelvic fracture to be "well-healed." (*Id.*)  Further, he stated: "In regards to her pelvis long-term, I would recommend that she be on a light to medium duty job profile with a position change[] in terms of sitting, standing, and walking as needed.  I believe that at this point her impairments are essentially permanent." (*Id.*)  That same day, Dr. Meinig completed a statement of disability, in which he wrote that "[Plaintiff] is unable to work due to chronic hip

---

[1]Radiculopathy is "[a]ny disease or abnormality of a . . . spinal nerve root from the point where it merges with the spinal cord (or brain stem) to the point where it joins its companion root (a motor or a sensory) to form a spinal nerve."  5–R ATTORNEYS' DICTIONARY OF MEDICINE 218 (Matthew Bender & Co. 2005).

pain until further notice." (*Id.* at 217.)  On September 2, 2005, Dr. Meinig indicated that

"[Plaintiff] would also probably be a candidate for some kind of light sedentary work.  Her chief

complaint relates to the left hip and buttock area." (*Id.* at 221.)  That same day, he also wrote,

"[Plaintiff] is disabled permanently from regular work." (*Id.* at 235.)

On October 7, 2005, Plaintiff presented to Dr. Meinig to complete her social security

impairment form.  (*Id.* at 220.)  Clinical notes from that day indicate Plaintiff was "able [to]

initiate independent ambulation as well as walk for the most part without any assistive devices."

(*Id.*)  Further, Dr. Meinig noted: "[Plaintiff] does use a cane intermittently and she feels that she

can not [sic] walk, sit or stand more than [one] or [two] hours at a time." (*Id.*)  The doctor went

on to state:

> I would say that a sitting, walking maximum of [four] hours is probably a
> reasonable goal.  She would probably have to sit or stand [for] no more than [one]
> hour intervals with frequent breaks.  She would be an occasional lifter of [five] to
> [twenty] pounds and probably never above [twenty] to [fifty] pounds.  This would
> apply to carrying.

(*Id.*)

That same day, Dr. Meinig wrote the following in a letter addressed "To Whom It May

Concern:"

> [Plaintiff] has healed her [elbow] fracture essentially uneventfully with perhaps a
> [fifteen] degree  extension lag at most with full flexion, pronation, and supination.
> In regards to her pelvis, she has had ongoing low grade discomfort to this point, I
> would state as permanent.
>
> Her medical diagnosis is a malgaigne left hemi pelvis status post internal fixation.
> She has an approximate [three-eighths] inch leg length discrepancy, again which is
> permanent.  She is limited in her ability to stand, walk, sit or stand for any
> prolonged length of time.  She probably by history can stand and walk for [thirty]

> to [forty-five] minutes without a break.  She does require occasional analgesics in
> the form of Vicodin or over the counter analgesics.

(*Id.* at 218.)  Dr. Meinig concluded that "there is no additional recovery that is anticipated," and

Plaintiff's "present impairment would probably preclude full-time employment and possibly part-

time." (*Id.* at 219.)  Finally, he found she was a "candidate for vocational assessment," and

suggested that "[i]f there is still a question as to her physical limitations, a work screening for

c[a]pacity could be performed by an independent provider." (*Id.*)

Also on October 7, 2005, Dr. Meinig filled out an impairment questionnaire regarding

Plaintiff. (*Id.* at 224–30.)  The questionnaire reflects that Plaintiff: (1) could independently initiate

ambulation; (2) experienced pain that interfered with her ability to ambulate effectively; (3) could

effectively climb stairs with the help of a hand rail; and (4) experienced daily pain that was not

completely relieved by medication. (*Id.* at 226.)  Dr. Meinig assessed Plaintiff as capable of: (1)

sitting four hours in an eight-hour day; (2) standing or walking four hours in an eight-hour day;

(3) lifting five pounds frequently and twenty pounds occasionally; and (4) carrying ten pounds

frequently and twenty pounds occasionally. (*Id.* at 227.)  He found Plaintiff was not capable of

sitting continuously, pushing, pulling, kneeling, bending, or stooping. (*Id.* at 227, 229.)  Further,

Dr. Meinig determined Plaintiff would need unscheduled breaks every two to three hours for ten

to fifteen minutes, and would likely miss work one to three times per month. (*Id.* at 229.)  He

also reported Plaintiff "periodically" experienced pain severe enough to interfere with her

attention and concentration, and that emotional factors affected her symptoms and impairments.

(*Id.* at 228.)  Finally, Dr. Meinig stated Plaintiff was not a malingerer and found she was capable

of low-stress work only.  (*Id.*)

## 2.    *Supplemental Medical Evidence Submitted to the Court*

Plaintiff submitted medical records to this court that were not before the ALJ or the

Appeals Council.  The first are the records of Ronald Baptist, MA, LPC, who saw Plaintiff from

December 2002 until July 2003 for PTSD and depressive disorder due to her accident.  (Pl.'s

Mot. to Supplement the R. [filed Nov. 29, 2006] [hereinafter "Pl.'s Mot. to Supplement"], Ex. 1

[Baptist R.].)  On August 4, 2006, Mr. Baptist created a summary of Plaintiff's treatment relaying

the following.  (*Id.*)  Plaintiff had severe depression and PTSD, and was on Prozac.  (*Id.*, Ex. 1 at

2, 4 [Baptist R.].)  Early in their treatment relationship, she showed difficulty with short and

intermediate-term memory, anxiety, panic attacks, and loss of sense of time, purpose, place,

and/or self.  (*Id.*, Ex. 1 at 4 [Baptist R.].)  Mr. Baptist found Plaintiff to "be a reliable reporter and

possess reasonable judgment."  (*Id.*)  Plaintiff was initially assessed with a global assessment of

functioning ("GAF") score of forty-five, but, upon completion of treatment, that score increased

to seventy.[2]  (*Id.*, Ex. 1 at 2 [Baptist R.].)  Mr. Baptist treated Plaintiff with a combination of eye

---

[2]The GAF scale is a tool for rating an individual's social, occupational, and psychological functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed., Text Revision, 2000).  A GAF score between forty and fifty indicates: (1) serious symptoms, such as suicidal ideation or severe obsessional rituals; or (2) a serious impairment in social, occupational, or school functioning, such as an inability to keep a job or a lack of friends.  *Id.*  An individual with a GAF score between sixty-one and seventy generally functions "pretty well" and "has some meaningful interpersonal relationships," but experiences: (1) some mild symptoms, such as depressed mood and mild insomnia; or (2) some difficulty in social or occupational functioning.  *Id.*

movement desensitization and reprocessing and cognitive behavioral therapy.  (*Id.*, Ex. 1 at 4

[Baptist R.].)  The final session notes from July 11, 2003 indicate that Plaintiff was "[f]eeling

much better" and "experiencing minimal and discreet episodes of depression and anxiety."  (*Id.*)

He noted that Plaintiff occasionally experienced a "'white flash' while driving that set[] off anxiety

and minor panic."  (*Id.*)  Mr. Baptist concluded that although "[Plaintiff] improved significantly

from an emotional standpoint, [she] may never gain total relief."  (*Id.*)  In a letter dated January

30, 2004, Mr. Baptists noted that Plaintiff "seemed to have recovered her ability to drive without

undue stress, and [according to Plaintiff's own report,] return[ed] to her pre-accident levels of

emotional health."  (*Id.*, Ex. 1 at 5 [Baptist R.].)

Plaintiff also submitted the records of Thomas McGuire, M.D.  (*Id.*, Ex. 2 [McGuire R.].)

Prior to the date of the ALJ's decision, Dr. McGuire's notes reflect that he treated Plaintiff for

depression and ongoing pain that Vicodin did not alleviate.  (*Id.*)  On February 17, 2003, he noted

that Plaintiff experienced "frequent stress headaches," both before and after the accident.  (*Id.*,

Ex. 2 at 9 [McGuire R.].)  He wrote: "Needless to say this accident has affected her life

traumatically leaving her unable to do any significant amount of physical activity, in the exam

room she can just shuffle around."  (*Id.*)  On October 6, 2005, Dr. McGuire indicated that

Plaintiff "cont[inued] to have chronic pain from the plates and screws to repair injuries sustained

in her [accident]."  (*Id.*, Ex. 2 at 8 [McGuire R.].)  He prescribed Cymbalta for depression, which

led Plaintiff to report dramatic improvements in November 2005.  (*Id.*, Ex. 2 at 7 [McGuire R.].)

Records dated after the ALJ decision indicate that Cymbalta ceased being effective, and

Plaintiff felt she was spiraling into depression.  (*Id.*, Ex. 2 at 5 [McGuire R.].)  She also

complained of severe pain in her hips.  (*Id.*)  On May 25, 2006, Dr. McGuire diagnosed Plaintiff

with depression secondary to chronic pain.  (*Id.*)  On July 12, 2006, Plaintiff presented with

complaints of a significant headache, and by July 19, 2006, clinical notes show these headaches

were "mild."  (*Id.*, Ex. 2 at 2–3 [McGuire R.].)  Dr. McGuire opined that the headaches were

"possibly post head trauma related."  (*Id.*)

### 3.    *Procedural History*

On December 9, 2002, Plaintiff filed an application for disability insurance benefits.  (*Id.* at

52–54.)  On April 2, 2003, the Social Security Administration denied Plaintiff's application.  (*Id.*

at 44–47.)  On May 6, 2003, Plaintiff requested a hearing before an administrative law judge

("ALJ").  (*Id.* at 42.)  On October 25, 2005, the ALJ held a hearing, at which Plaintiff and a

vocational expert ("VE") testified.  (*Id.* at 240–62.)

Plaintiff testified that she sustained one concussion as a result of the motor vehicle

accident and two concussions after falling off the bridge.  (*Id.* at 245.)  She claimed to have last

worked in February of 2004 as a general office assistant.  (*Id.* at 243–44.)  She left the position

after two months, because could not sit or stand long enough to perform her duties, which

included answering phones, filing, and other general office work.  (*Id.* at 244.)

She testified to "constant" pain on both sides of her pelvis, which she described as a

"sword that goes from the hipbone to the other hipbone and somebody is in there just twisting it."

(*Id.* at 246.)  Plaintiff also experienced throbbing pain that radiated down both her legs and up her

spine.  (*Id.* at 247.)  Prolonged sitting and driving, as well as cold weather and activity worsened

her pain.  (*Id.* at 246–47.)  Lying down and utilizing a heating pad helped her pain.  (*Id.*)  She also

stated that, depending on how bad her pain was, she had to lie down for fifteen minutes to a half-hour anywhere from three times daily to all day.  (*Id.* at 247.)

Plaintiff testified to experiencing what she termed "spinal headaches," which ran up her spine and caused her arms and legs to go numb and tingle.  (*Id.* at 248.)  She stated that her hands went numb two to three times each week, causing her to drop things quite frequently.  (*Id.* at 248–49.)  Plaintiff also claimed to experience a "delayed response" in her left hand two to three times each week.  (*Id.* at 249–50.)

Plaintiff testified to experiencing day-long headaches that significantly interfered with her ability to concentrate and required her to take fifteen minute to half-hour breaks on an hourly basis.  (*Id.* at 250–51.)  Plaintiff also stated that she had trouble sleeping and that both the headaches and sleeping problems were related to her accident.  (*Id.* at 251.)

Regarding her elbow, Plaintiff explained she felt numbness and experienced pain once or twice a week for the entire day that was worsened by the cold.  (*Id.* at 252.)  She claimed not to use her left arm much and to have lost some extension in that arm.  (*Id.* at 252–53.)

Plaintiff testified she was able to sit for one hour before she had to get up and move for fifteen to thirty minutes.  (*Id.* at 253.)  Further, she said she could sit for three hours, with breaks, during an eight-hour workday, and stand continuously for two hours.  (*Id.*)  She also stated that she could alternate between sitting and standing for at most three to four hours in an eight-hour workday.  (*Id.* at 254.)  Otherwise, she experienced "excruciating pain" in her pelvis and legs, and tingling and swelling in her hands and legs.  (*Id.*)  Plaintiff stated she was taking prescription and

non-prescription pain medication, which caused her to experience a "drug induced kind of haze" and drowsiness. (*Id.* at 254–55.)

Plaintiff testified she had more bad days than good in a month. (*Id.* at 255.)  A typical bad day started with her back hurting so badly she felt she could not get up. (*Id.*)  Nonetheless, she would get out of bed in order to take her son to school, return home, take a Vicodin, and lie in bed all day with a heating pad. (*Id.*)  Her daily activities included: (1) driving; (2) cooking "quick and easy dinners;" (3) cleaning the house a little at a time; and (4) grocery shopping with the assistance of her son. (*Id.* at 256–57.)

The VE testified at the hearing regarding his review of the vocational exhibits in Plaintiff's file. (*Id.* at 258–62.)  The VE testified that Plaintiff's past work as: (1) a dispatcher was sedentary with a specific vocational preparation ("SVP")[3] of four; (2) home cleaner was heavy with an SVP of two; (3) waitress and office assistant were light with SVPs of three; and (4) neighborhood servicer was light with an SVP of 5. (*Id.* at 259.)

Additionally, the VE opined on a series of hypothetical questions posed by Plaintiff's attorney. (*Id.* at 260–62.)  First, the VE testified that an individual of Plaintiff's age, education, and past relevant work that could sit no more than three hours and stand no more than three hours in an eight-hour work day could perform Plaintiff's past work as a radio dispatcher, neighborhood servicer, and office assistant. (*Id.* at 260.)  Second, the VE opined that this same

---

[3]SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Dikeman v. Halter*, 245 F.3d 1182, 1186 n.2 (10th Cir. 2001) (citation and internal quotation marks omitted).

hypothetical individual, with the additional limitation of needing to be absent from work one to three times a month due to her impairments, would be able perform the job of a general office worker and neighborhood servicer.  (*Id.* at 260–61.)  Third, the VE opined that the same individual, with the additional limitation of being able to concentrate for only an hour before needing a fifteen minute to half-hour break would be precluded from sustaining any type of employment.  (*Id.* at 262.)  Finally, the VE opined that this same individual, without the concentration problems, but with the additional limitation of needing two to three unscheduled ten to fifteen minute breaks during an eight-hour workday, would not be able to sustain any full-time employment.  (*Id.* at 260.)

On November 30, 2005, the ALJ issued a decision reflecting his finding that Plaintiff was not disabled within the meaning of the Social Security Act, because Plaintiff retained the residual functioning capacity ("RFC") to perform the full range of sedentary work.  (*Id.* at 16–24.)  In reaching his conclusion, the ALJ first found that Plaintiff had not engaged in substantial gainful activity since November 13, 2002.  (*Id.* at 18.)  The ALJ next determined that Plaintiff's status-post pelvic fracture was a medically determinable, severe impairment.  (*Id*. at 18–19.)  Despite its severity, the ALJ determined that the impairment was not sufficiently severe to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4.  (*Id*. at 20.)  Additionally, the ALJ found that Plaintiff's "statements concerning the intensity, duration and limiting effects of [her] symptoms [were] not entirely credible."  (*Id.* at 21.)  The ALJ concluded that Plaintiff could perform her past relevant work as a dispatcher.  (*Id.* at 22–23.)  In the

alternative, the ALJ found that even if Plaintiff could not return to her past work as a dispatcher, she still had the RFC for the full range of sedentary work.  (*Id.*)

On June 19, 2006, the Appeals Council affirmed the ALJ's decision, making it the final administrative decision for the purposes of judicial review.  (*Id.* at 6–8.)  On August 16, 2006, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed Aug. 16, 2006].)  On December 15, 2006, Plaintiff filed her opening brief.  (Pl.'s Opening Br. [filed Dec. 15, 2006] [hereinafter "Pl.'s Br."].)  On January 16, 2007, the Commissioner filed a response.  (Def.'s Resp. Br. [filed Jan. 16, 2007] [hereinafter "Def.'s Resp."].)  On January 30, 2007, Plaintiff replied in support of her brief.  (Pl.'s Reply Br. [filed Jan. 30, 2007] [hereinafter "Pl.'s Reply"].)

## ANALYSIS

### 1.    *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall

> review only the question of conformity with such regulations and
> the validity of such regulations.

42 U.S.C. § 405(g) (2006). Thus, this court's review is limited to determining whether the record

as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992). The

court must uphold the Commissioner's decision if it is supported by substantial evidence. *See*

*Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence

nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316

(10th Cir. 1987). That does not mean, however, that my review is merely cursory. To find that

the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant

evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey*

*v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if

it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence

supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also

subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297,

299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.    *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that

the claimant meets the insured status requirements, is less than sixty-five years of age, and is

under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security

Act defines a disability as an inability "to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2007); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2007); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2007). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations

omitted).  If the claimant is able to perform his previous work, she is not disabled.  20 C.F.R. §

404.1520(e) (2007); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to

demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's

age, education, past work experience; and (2) there is availability of that type of work in the

national economy.  *See* 20 C.F.R. § 404.1520(f) (2007); *Williams*, 844 F.2d at 751.

**4.      Disability Determination**

Plaintiff sets forth four arguments in support of her contention that the ALJ's decision is

erroneous.  (Pl.'s Br. at 16–27.)  Plaintiff argues the ALJ failed to: (1) base his decision on

substantial evidence; (2) give proper deference to Dr. Meinig's opinion as a treating physician; (3)

fully develop the record; and (4) properly assess Plaintiff's credibility.  (*Id.*)  I address each

argument below.

**a.      Preliminary Matter: Supplemental Evidence**

As a preliminary matter, I address the Commissioner's contention that this court lacks

jurisdiction to consider any of Plaintiff's proffered supplemental medical evidence that was not

before the ALJ or the Appeals Council.  (Def.'s Br. at 25–26.)  Plaintiff counters that the reports

of Mr. Baptist and Dr. McGuire constitute new and material evidence relevant to the issue of

whether Plaintiff had a severe psychological impairment and other severe conditions preventing

her from engaging in substantial gainful activity.  (Pl.'s Reply at 13–14.)

As an initial matter, I note that this circuit has made clear additional evidence is to be

considered "only where it relates to the period on or before the date of the [ALJ] hearing

decision."  20 C.F.R. § 404.970(b) (2007); *see Hargis v. Sullivan*, 945 F.2d 1482, 1493 (10th

Cir. 1991) (finding remand based on new evidence is only appropriate when "the proffered

evidence relate[s] to the time period for which the benefits were denied").  Because Dr.

McGuire's medical findings made after the date of the ALJ decision do not indicate that they

reflect Plaintiff's condition at the time of the ALJ decision, I cannot consider them here.  (*See*

Pl.'s Mot. to Supplement, Ex. 2 at 2–5 [McGuire R.].)

Regarding the new evidence dated prior to the ALJ decision, this court may only order

remand if it concludes "the new evidence would have changed the [ALJ's] decision had it been

before him."  *Hargis*, 945 F.2d at 1493 (10th Cir. 1991); *see also* 42 U.S.C. § 405(g) (2007)

(noting the court "may at any time order additional evidence to be taken before the Commissioner

of Social Security, but only upon a showing that there is new evidence which is material and there

is good cause for the failure to incorporate such evidence into the record in a prior proceeding").

The parties have appropriately framed this issue as a question of materiality.  (Def.'s Br. at 25–26;

Pl.'s Reply at 13–14.)

First, regarding Mr. Baptist's records, I find that even if the ALJ had considered them,

there is no reasonable probability that the new evidence would have changed the ALJ's disability

determination.[4]  Mr. Baptist treated Plaintiff for eight months — from December 2002 to July

2003 — for PTSD and depressive disorder due to her accident.  (*Id.*, Ex. 1 [Baptist R.].)  At the

end of her treatment, he found her to have a GAF score of seventy, which means she was

---

[4]In making this finding, I assume without deciding that Mr. Baptist — as Plaintiff urges —
is an "other source" whose opinion may be relied upon by the ALJ in determining the severity of
Plaintiff's impairment and its affect on her ability to work.  (*See* Pl.'s Br. at 8 [citing 20 C.F.R. §
404.1513(d)].)

functioning "pretty well" in spite of mild symptoms and some social and occupational difficulties.

(*Id.*, Ex. 1 at 2 [Baptist R.].)  More importantly, he noted that Plaintiff, according to her own

account, had "return[ed] to her pre-accident levels of emotional health."  (*Id.*, Ex. 1 at 4 [Baptist

R.].)  Consequently, I find the medical evidence contained in Mr. Baptist's records is immaterial.

Secondly, Plaintiff argues that her complaints of headaches noted in Dr. McGuire's

records were material.  (*See* Pl.'s Br. at 18; Pl.'s Reply at 13.)  It is true that on February 17,

2003, Dr. McGuire noted that Plaintiff experienced "frequent stress headaches."  (Pl.'s Mot. to

Supplement, Ex. 2 at 9 [McGuire R.].)  Nonetheless, there is absolutely no indication that these

headaches constituted a disabling condition for Plaintiff.  To the contrary, Dr. McGuire's notes

indicate that Plaintiff experienced these headaches both *before* and after the accident.  (*Id.*)  Such

symptoms could not conceivably have affected the ALJ's analysis.  Based on the foregoing, I find

none of Plaintiff's supplemental medical evidence dated prior to the ALJ's decision is material;

thus, this court has no jurisdiction to consider it.[5]  *See* 42 U.S.C. § 405(g) (2006).

### b.      Substantial Evidence Supporting the ALJ's Decision

Plaintiff argues that in evaluating her claim at step two, the ALJ's determination that

Plaintiff's (1) psychological impairments, (2) headaches, (3) spinal fractures, and (4) elbow

fracture were not severe impairments was not supported by substantial evidence.  (Pl.'s Br. at

16–20.)  I address each alleged impairment in turn.  First, Plaintiff asserts that the ALJ, in finding

---

[5]As a corollary to the determinations in this section, I find any failure of the ALJ to develop the record regarding Plaintiff's psychological impairments was harmless.  *See Glass v. Shalala*, 43 F.3d 1392, 1397 (10th Cir. 1994) (holding harmless error where evidence issue would not have unfairly affected the ultimate result).

"no indication of post-concussive syndrome," failed to consider notes by Plaintiff's rehabilitation

physician, speech language pathologist, occupational therapist, and physical therapist noting

symptoms of a psychological impairment, such as trouble with memory, decreased attention,

tangential and verbose speech, and the inability to follow complex directions and maintain a train

of thought. (*Id.* at 16–17.) Further, argues Plaintiff, the ALJ ignored Dr. Kelly's findings upon

Plaintiff's discharge that she exhibited traumatic brain injury symptomolgy and PTSD. (*Id.* at 17.)

Initially, I note that the ALJ "is not required to discuss every piece of evidence," so long

as the record demonstrates the ALJ considered all of the relevant evidence. *Clifton v. Chater*, 79

F.3d 1007, 1009–10 (10th Cir. 1996). Additionally, as the Commissioner points out, the findings

identified by Plaintiff are from the days and weeks immediately following her accident. (*See*

Def.'s Br. at 17–18; Admin. R. at 181–90.) Notes from the subsequent years of follow-up

appointments reveal no evidence that Plaintiff complained of disabling psychological symptoms.

(*See* Admin. R. at 92–235.) Moreover, Plaintiff failed to allege psychological problems as a

disabling condition in her disability application, although she did state that she had some

difficulties with concentration and memory since the accident in her daily activity questionnaire.

(*Id.* at 65, 75–76.) Still, I find substantial evidence — namely, Plaintiff's failure to complain of

psychological impairments to any of her doctors over the years following her accident — supports

the ALJ's conclusion that Plaintiff did not have a disabling psychological condition.

Second, Regarding Plaintiff's alleged headaches and PTSD, as discussed above, neither of

these impairments were material, and, thus, any failure to consider them was harmless. *See Glass*,

43 F.3d at 1397.

Third, Plaintiff urges that because the ALJ failed to mention the multiple fractures in Plaintiffs lumbar spine and her sacrum, he erred in finding Plaintiff had no severe impairments. (Pl.'s Br. at 18–19.)  As the Commissioner points out, however, Plaintiff never sought treatment for her back injuries, nor has she supplied any evidence that she was functionally limited by a back impairment.  (Def.'s Br. at 25.)  Consequently, substantial evidence supports the ALJ's choice to focus on Plaintiff's pelvic injury, and not to address Plaintiff's back fractures.

Finally, Plaintiff contends the ALJ's finding that Plaintiff's elbow fracture did not result in a severe impairment was not supported by substantial evidence.  (Pl.'s Br. at 19–20.)  The ALJ considered the effects of Plaintiff's elbow fracture in some detail and concluded the impairment was not severe based on specific citation to the medical record that indicates: (1) "the fracture was anatomically aligned and well-healed;" (2) Plaintiff was "doing quite well in her physical and occupational therapy and had gained a significant amount of flexion and extension in her elbow;" and (3) "her [elbow] fracture healed uneventfully and she experienced no more than a fifteen degree extension lag at most with full flexion, pronation, and supination."  (Admin. R. at 19.)  Plaintiff does not contest these findings.  Instead, she points to the only record medical evidence arguably supporting her argument for severe impairment — the functional capacity assessment by Dr. Meinig, where he lists Plaintiff's conditions as including both a non-stable left hemi pelvic fracture *and* an elbow fracture.  (Pl.'s Br. at 19.)  Plaintiff contends that Dr. Meinig was contemplating her elbow fracture when he restricted her to lifting and carrying no more than five to ten pounds frequently and twenty pounds occasionally.  (*Id.*)  Yet, there is absolutely no indication on the assessment that Dr. Meinig was specifically considering Plaintiff's elbow fracture

when suggesting such a limitation.  (*See* Admin. R. at 227.)  Moreover, I note that Plaintiff cannot

prove error by showing there are medical findings consistent with her complaints of limitation due

to her elbow fracture; instead, Plaintiff must show that the ALJ's determination regarding the

fracture is not supported by substantial evidence.  *Ellison v. Sullivan*, 929 F.2d 534, 536 (10th

Cir. 1990).  Here, there is substantial evidence supporting the ALJ's conclusion that Plaintiff's

impairments due to her elbow fracture were not severe.

### c.       Dr. Meinig's Opinion

Plaintiff contends that, in assessing Plaintiff's RFC, the ALJ failed to properly consider the

opinions of Dr. Meinig, Plaintiff's treating physician, because the ALJ cited only those opinions

that supported his findings of non-disability and failed to recontact the doctor for clarification of

any inconsistencies.  (Pl.'s Br. at 20–24.)  It is well established that an ALJ is required to give

controlling weight to a treating physician's well supported opinion, so long as it is not inconsistent

with other substantial evidence of record.  *See* 20 C.F.R. § 404.1527(d)(2) (2007); *Hamlin v.*

*Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004); *Frey*, 816 F.2d at 513.  If an ALJ decides not to

give a treating physician's opinion controlling weight, the ALJ must consider a series of factors in

determining the amount of weight to give the opinion, including the degree to which the opinion is

supported by relevant evidence and the opinion's consistency with the record as a whole.  *See* 20

C.F.R.§ 404.1527(d)(2)–(6) (2007); *Goatcher v. U.S. Dep't of Health & Human Servs.*, 52 F.3d

288, 290 (10th Cir. 1995).  Should an ALJ choose to disregard the opinion of a treating physician,

the ALJ must set forth "specific, legitimate reasons" for doing so.  *Hamlin*, 365 F.3d at 1215.

In the instant case, the ALJ assigned "significant weight" to certain of Dr. Meinig's opinions.  (Admin. R. at 22.)  In particular, the ALJ found Dr. Meinig's conclusion persuasive that Plaintiff was capable of lifting twenty pounds occasionally and five pounds frequently, as well as standing or walking up to four hours per day and sitting up to four hours per day.  (*Id.* at 22, 220, 224–30.)  At the same time, the ALJ chose to give "minimal weight" to statements by Dr. Meinig indicating Plaintiff was permanently disabled from regular work, "because these statements stand in direct contradiction with the physician's own treatment records and his repeated notes that [Plaintiff was] capable of work ranging from the sedentary to the medium exertional level."  (*Id.* at 22.)

I find the ALJ failed to set forth legitimate reasons for rejecting significant portions of Dr. Meinig's opinions.  I begin by noting that although the ALJ claimed to give credence to Dr. Meinig's opinions as expressed in exhibits 8F and 9F, this is not so.  (*See id.*)  Page two of exhibit 8F indicates that Plaintiff had reached maximum therapeutic benefit and that "her present impairment would probably preclude full-time employment and possibly part-time."  (*Id.* at 219.)  It is true, as the Commissioner points out, that such opinions are not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Commissioner.  *Castellano v. Sec'y of Health and Humans Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1992).  Still, the ALJ should consider such findings.  *Ricketts v. Apfel*, 16 F. Supp. 2d 1280, 1293 (D. Colo. 1998).  Further, the ALJ failed to include in Plaintiff's RFC several limitations noted in exhibits 8F and 9F, including Plaintiff's need to: (1) take a break after standing and walking for thirty to forty-five minutes; (2) change positions from sitting to standing to walking as needed; (3) take unscheduled

-22-

breaks every two to three hours for ten to fifteen minutes; (4) miss work one to three times per month; and (5) engage in low stress work only.  (Admin. R. at 218, 222, 227–29.)  Here, the ALJ only attempted to explain why he gave little credence to Dr. Meinig's opinion that Plaintiff was not capable of full-time work; the ALJ does not even acknowledge his failure to incorporate all of Dr. Meinig's limitations in the RFC.[6]  (*See id.* at 22.)  Consequently, the ALJ commited reverisble error when he failed to explain his decision not to adopt Dr. Meinig's opinion regarding Plaintiff's limitations.  *Sitsler v. Barnhart*, 182 Fed. App'x 819, 823 (10th Cir. 2006).

Additionally, Dr. Meinig's records are replete with suggestions that Plaintiff is incapable of full-time work as well as medical findings arguably supporting this conclusion.  Specifically, Dr. Meinig: (1) found Plaintiff was "unable to work due to chronic hip pain until further notice;" and (2) after reviewing Plaintiff's diagnosis, concluded "no additional recovery is anticipated" and that "her present impairment would probably preclude full-time employment and possibly part time." (Admin. R. at 24–25.)  "The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Hamlin*, 365 F.3d at 1219.

Finally, both the ALJ and the Commissioner recognize inconsistencies in the ALJ's opinion regarding Plaintiff's work capacities and functional abilities.  (*See* Admin. R. at 22; Def.'s Resp. at 21–22.)  An ALJ has a duty to weigh the evidence and resolve material conflicts in the

---

[6]I note this issue may well be pivotal to Plaintiff's case, because the VE's testimony strongly suggests that missing one to three days of work each month and requiring two to three unscheduled ten to fifteen minute breaks during an eight-hour work day, would limit or prevent Plaintiff from engaging in full-time employment.  (*See* Admin. R. at 260–62.)

record; yet, the ALJ must have sufficient information to resolve such conflicts. *See* 20 C.F.R. § 404.1512(e), (f) (2007). Social security regulations mandate that when the evidence before the ALJ is inadequate to determine whether a plaintiff is disabled, the ALJ should recontact the appropriate medical source, or — if that medical source cannot or will not provide the necessary findings — ask the plaintiff to attend one or more consultative examinations at the expense of the Social Security Administration. *Id.* In a case such as the one at bar, where the primary opinion relied upon in assessing Plaintiff's RFC contains blatantly contradictory statements, the ALJ had insufficient information on which to base his disability determination.[7] The ALJ should have either recontacted Dr. Meinig to resolve the inconsistency or ordered a consultative examination. *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (finding ALJ had a statutory duty to obtain additional information before determining that a treating physician did not agree with the assessment he signed); *Ricketts*, 16 F. Supp. 2d at 1293 (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1491 [10th Cir. 1993]) ("In the absence of evidence upon which to make a finding as to RFC, the ALJ should order a consultative examination to determine the claimant's capabilities."). Based on the foregoing, I find the ALJ's treatment of Dr. Meinig's opinion was in error because the ALJ: (1) failed to provide legitimate reasons for disregarding significant portions of the doctor's opinion; and (2) should have, considering his seemingly exclusive reliance

---

[7]That Dr. Meinig's opinions were contradictory may have been a specific and legitimate reason for rejecting the doctor's opinion altogether; however, the contrariness does not allow the ALJ to pick and choose which portions of the opinion to give controlling weight without pointing to specific and legitimate reasons for doing so.

on Dr. Meinig's opinion in assessing Plaintiff's RFC, recontacted the doctor to resolve the inconsistencies in his opinion or ordered a consultative examination.

### d.    Credibility Assessment

Plaintiff argues the ALJ erred in finding her less than fully credible.  (Pl.'s Br. at 27–31.) The ALJ found "[Plaintiff's] statements concerning the intensity, duration and limiting effects of [her] symptoms were not entirely credible," because: (1) within two months of the injury she was noted to be doing "quite well," with good motor sensation and function in her lower exteremities; (2) she was allowed to progress to full weight-bearing activities as tolerated; (3) Dr. Meinig indicated that within one year after the accident, Plaintiff would be able to return to sedentary or light office work; (4) there was a sizeable treatment gap in Plaintiff's medical records; (5) her treatment notes indicate Plaintiff had returned to domestic housecleaning work after her injury; (6) at several points, Plaintiff's treating physician indicated Plaintiff would be capable of sedentary work; (7) Plaintiff's testimony regarding her headaches, upper-extremity pain, concentration, and sleep problems reflected more extreme problems than any of her treatment notes indicate; (8) Plaintiff did not engage in physical therapy except shortly after the accident and has not participated in a pain clinic; and (9) Plaintiff is able to care for her school-age children.  (Admin. R. at 21–22.)

"'Credibility determinations are peculiarly the province of the [ALJ].'"  *McGoffin*, 288 F.3d at 1254 (quoting *Kepler v. Chater*, 68 F.3d 387, 391 [10th Cir. 1995]).  Indeed, credibility determinations made by an ALJ are generally considered binding upon review.  *Gossett v. Bowen*, 962 F.2d 802, 807 (10th Cir. 1988).  Such determinations "should not be upset if supported by

substantial evidence." *White v. Barnhart*, 287 F.3d 903, 910 (10th Cir. 2001).  However,

"findings as to credibility should be closely and affirmatively linked to substantial evidence and not

just a conclusion in the guise of findings." *Huston*, 838 F.2d at 1133.  In assessing credibility, the

ALJ may consider several factors, including subjective measures of credibility, as well as the

consistency of the nonmedical evidence with the medical record.  *See Eggleston v. Bowen*, 851

F.2d 1244, 1247 (10th Cir. 1988).

Plaintiff attacks the ALJ's credibility assessment on multiple fronts.  (*See* Pl.'s Br. at

27–30.)  First, Plaintiff argues "[i]t was improper for the ALJ to assume that the gap in treatment

meant that [Plaintiff] was not suffering from her impairments, without obtaining any additional

information about why the gap occurred."  (*Id.* at 27.)  As Plaintiff points out, one of the

Commissioner's own social security rulings prohibits the ALJ from drawing a negative inference

from failure to seek treatment, without gathering information regarding the reason for this failure:

> [T]he adjudicator must not draw any inferences about an individual's symptoms
> and their functional effects from a failure to seek or pursue regular medical
> treatment without first considering any explanations that the individual may
> provide, or other information in the case record, that may explain infrequent or
> irregular medical visits or failure to seek medical treatment.  The adjudicator may
> need to recontact the individual or questions the individual at the administrative
> proceeding in order to determining whether there are good reasons the individual
> does not seek medical treatment or does not pursue treatment in a consistent
> manner.

Soc. Sec. Ruling 96–7p, 1996 SSR LEXIS 4, at *21 (July 2, 1996); *Miranda v. Barnhart*, 205

Fed. App'x 638, 642 (10th Cir. 2005).

Here, the ALJ failed to question Plaintiff regarding any possible reasons behind her lapse

in treatment.  Under Ruling 96–7p, it was improper for the ALJ to simply assume that the

treatment gap was evidence of a lack of impairment without further inquiry.  *See Miranda*, 205

Fed. App'x at 642 (finding error when ALJ failed to indicate that he had considered any

alternative explanations for the plaintiff's failure to seek medical treatment); *Brennan-Kenyon v.*

*Barnhart*, 252 F. Supp. 2d 681, 697 (D. Ill. 2003) ("[B]ecause there is insufficient evidence in the

record regarding Plaintiff's reason[s] for not seeking medical treatment . . . the ALJ should have

sought out additional information and developed the record in this area in order to properly assess

Plaintiff's credibility."); *Wates v. Barnhart*, 172 F. Supp. 2d 1087, 1097 (D. Wis. 2001) ("Even

assuming that the evidence warranted the ALJ's conclusion that plaintiff's doctor visits were

intermittent or infrequent, the ALJ should not have drawn an adverse inference with respect to her

credibility without making additional inquiry [under SSR 96–7p].").

Second, Plaintiff argues the ALJ improperly relied on Dr. Meinig's statements that she

was able to perform sedentary work to discredit Plaintiff's complaints of pain.  (Pl.'s Br. at 28.)

As discussed above, Dr. Meinig made numerous blatantly contradictory statements regarding

Plaintiff's ability to engage in full-time work.  (*See Analysis* § 4c, *supra*.)  It was improper for the

ALJ to pick and choose only those statements of Dr. Meinig that arguably cast doubt on

Plaintiff's complaints of pain when the doctor made contemporaneous statements that arguably

corroborated Plaintiff's complaints of pain.  (*See id.*)  Because there is insufficient record

evidence to determine which of Dr. Meinig's opinions is most accurate, his opinion neither

bolsters nor casts doubt upon Plaintiff's credibility.

Third, Plaintiff argues one isolated reference to her return to housecleaning work should

not have affected the ALJ's credibility assessment.  (Pl.'s Br. at 28.)  I find the statement is

relevant to Plaintiff's credibility.  That Plaintiff voluntarily returned to physical work at some

point after her accident may suggest that her pain was not as severe as she claimed.  However,

eight months after Dr. Meinig's reference to Plaintiff's return to work, he noted that the "light

housekeeping that [Plaintiff] has been trying to do has not been well-tolerated."  (*Id.* at 222.)

Moreover, intermittent work does not necessarily contradict a claim of disabling pain.  *Frey*, 816

F.2d at 516–17; *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).  Thus, although

consideration of this statement was not clearly erroneous, Plaintiff's isolated reference regarding

returning to housecleaning does not constitute substantial evidence supporting the ALJ's

credibility determination.

Fourth, Plaintiff contends that the fact that she had no physical therapy except in the few

months following the accident, and did not participate in a pain clinic should not affect her

credibility.  (Pl.'s Br. at 29.)  The Tenth Circuit has mandated that:

> before the ALJ may rely on the [plaintiff's] failure to pursue treatment . . . for his
> determination of noncredibility, he or she should consider "(1) whether the
> treatment at issue would restore [the plaintiff's] ability to work; (2) whether the
> treatment was prescribed; (3) whether the treatment was refused; and, if so, (4)
> whether the refusal was without justifiable excuse."

*Thompson*, 987 F.2d at 1490 (quoting *Frey*, 816 F.2d at 517).  Here, the ALJ failed to undertake

this analysis.  (*See* Admin R. at 21–22.)  Moreover, there is no evidence on record that such

treatments were prescribed, were refused, or would have restored Plaintiff's ability to work.  To

the contrary, Dr. Meinig determined that Plaintiff's impairments were "permanent" and that "no

additional recovery [was] anticipated."  (*Id.* at 218–19, 222.)  Based on the foregoing, I find any

lack of physical therapy or involvement in a pain clinic does not constitute substantial evidence

supporting the ALJ's credibility determination.  *See Thompson*, 987 F.2d at 1490 (the ALJ erred

in determining that failure to take medication affected the plaintiff's credibility, because there was

no evidence that the prescription medication was effective or that it would have allowed the

plaintiff to work).

Fifth, Plaintiff urges that the ALJ's reliance on Plaintiff's "apparent" ability to "care for

her school-age children, and cook, shop and clean her house on a regular basis" in casting doubt

on her credibility was in error.  (Pl.'s Br. at 29–30.)  At the hearing, Plaintiff testified that her

daily activities were limited to: (1) getting her son out of bed and taking him to school; (2) driving

with pain; (3) cooking "quick and easy dinners," such as macaroni and cheese from a box; (3)

cleaning the house a little at a time because the bending and stooping caused her pain; and (4)

grocery shopping with her son's assistance in pushing the shopping cart.  (Admin. R. at 256–57.)

Her daily activity questionnaire, filled out over two years prior to the hearing, painted an even less

active picture of Plaintiff's daily life.  (*Id.* at 74–77.)  Put simply, these minimal daily activities are

wholly insufficient to support the ALJ's credibility determination.  *Thompson*, 987 F.2d at 1490

(finding "the ALJ may not rely on minimal daily activities as substantial evidence that a claimant

does not suffer disabling pain").

Finally, Plaintiff argues the ALJ's conclusion that the intensity of the pain Plaintiff

described at the hearing was greater than what she described to her doctors was in error.  (Pl.'s

Br. at 30.)  In particular, the ALJ found that Plaintiff's description of her "frequent disabling

headaches," as well as complaints of arm numbness, were not reflected in the medical record.

(Admin. R. at 21.)  It is true that, on the record before the ALJ, Plaintiff had not complained of

her disabling headaches to her doctors.  (*Id.* at 92–235.)  Further, although Plaintiff did mention

upper extremity discomfort to two doctors, there is no mention in the medical record that: (1) her

hands went numb two to three times each week, causing her to drop things frequently; (2) she

experienced a "delayed response" in her left hand; (3) she felt elbow pain once or twice a week

that lasted the entire day and caused her to greatly decrease the use of her left arm.  (*See id.* at

197, 223, 248–50, 252–53.)  I consider the question of whether the ALJ erred in his credibility

assessment a close one.  Nonetheless, although Plaintiff has identified certain infirmities in the

ALJ's credibility assessment, I find that, considering the deference this court owes the ALJ in

reviewing such determinations, his assessment of Plaintiff's credibility is supported by substantial

evidence.  In particular, I find the inconsistency between Plaintiff's complaints of pain and

impairment at the hearing when compared to her complaints to her doctor is sufficient, standing

alone, to support the ALJ's determination.  *See Eggleston*, 851 F.2d at 1247 (holding an ALJ may

question credibility based on inconsistencies between the plaintiff's testimony and other record

evidence).  I recognize that no such inconsistency has been identified regarding Plaintiff's pain due

to her pelvic fractures, which appear to cause her the most significant degree of pain.  Still, I find

that inconsistencies in her testimony concerning some of her pain may reasonably be found to

reflect on her credibility regarding all her reports of pain.

**4.**     ***Conclusion***

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is

REVERSED and REMANDED for proceedings consistent with this opinion.

Dated this 3rd day of May, 2007.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge